## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**MARK W. DOBRONSKI**,                    Case No.
an individual,
                    Plaintiff,

v.

**BROOKESTONE FUNDING INC.**,
a New York corporation;
**ISAAC QUBRUSI**,
an individual; and
**ALBERT KATZ**,
an individual,
                    Defendants.

_____

## <u>FIRST AMENDED COMPLAINT</u>

NOW COMES the Plaintiff, MARK W. DOBRONSKI, appearing *in propria persona*, and for his complaint against the named Defendants alleges:

1.  This matter arises under the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, *et seq.*, and the Michigan Home Solicitation Sales Act ("MHSSA"), M.C.L. § 445.101, *et seq.*

<u>Parties</u>

2.  Plaintiff is an individual, of the age of majority, a citizen of the United States of America, has a domicile and has a place of business in Orange County, Florida, has a residence and place of business in Washtenaw County, Michigan, and has a place of

1

business in Wayne County, Michigan.

3. Defendant BROOKESTONE FUNDING INC. ("Brookestone") is a corporation organized and existing under the laws of the state of New York, with a principal office located at 2002 Coney Island Avenue, Brooklyn, New York 11223-2329.

4. Defendant ISAAC QUBRUSI ("Qubrusi") is an individual, of the age of majority, is mentally competent, is not in the military service, and resides at 2002 Coney Island Avenue, Brooklyn, New York 11223-2329.

5. Defendant ALBERT KATZ ("Katz") is an individual, of the age of majority, is mentally competent, is not in the military service, and resides in Hackensack, New Jersey. The name Albert Katz may be an alias and Plaintiff reserves the right to amend the Complaint to reflect Katz' true name upon learning same.

<u>Jurisdiction</u>

6. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

7. This court has special or limited personal jurisdiction over Defendant Brookestone, pursuant to M.C.L. § 600.715, as a result of each defendant or its agent: transacting any business within the state; or, doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.

<u>Venue</u>

8. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), as the

tortious or illegal telephone calls complained of herein were directed to a telephone number with a Michigan area code, and were received by Plaintiff at his residence in this judicial district, to wit: in Washtenaw County, Michigan.

Preliminary Statement

9.  As the Supreme Court recently explained, "Americans passionately disagree amount many things.  But they are largely united in their disdain for robocalls." *Barr v. American Association of Political Consultants LLC*, 140 S. Ct. 2335, 2343 (2020).

10.  The Federal Government receives a staggering number of complaints about robocalls – 3.7 million complaints in 2019 alone. *Id.*

11.  In response to widespread public outrage over intrusive telemarketing calls to homes and businesses, the United States Congress acted to prevent persons, like Defendant, from invading American citizen's privacy and to prevent abusive "robo-calls" by enacting the TCPA.

12. According to the Federal Communications Commission ("FCC"), "unwanted calls and texts are the number one complaint to the FCC."

13.  In regard to such telephone solicitations, Senator Hollings of South Carolina, the primary sponsor of the TCPA, explained, "computerized calls are the scourge of modern civilization.  They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall... these computerized telephone calls threaten our personal safety... These machines are out of control, and their use is growing by

3

30 percent every year.  It is telephone terrorism, and it has got to stop....” <u>See</u> *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 17 FCC Rcd. 17459, 17474, fn. 90 (2002), quoting 137 Cong. Rec. 30,821-30,822 (Nov. 7, 1991).

14.  According to YouMail, Inc., a company which tracks robocall activity and publishes the YouMail Robocall Index, during calendar year 2023 alone, American consumers were bombarded with over 55.05 *billion* robocalls; an average of over 165 robocalls to each and every man, woman, and child.[1]

15.  In 2021, nearly 1 in 3 Americans say they have fallen victim to a phone scam in the past year, with reported losses to phone scams exceeding $29.8 Billion.[2]

16.  Congress has found that interstate telemarketing fraud has become a problem of such magnitude that the resources of the Government are not sufficient to ensure adequate consumer protection from such fraud.

17.  As a result, in enacting the TCPA, Congress intentionally created a legally enforceable bounty system, not unlike *qui tam* statutes, to incentivize the assistance of aggrieved private citizens to act as “private attorneys general” in enforcing federal law.

<u>Telephone Consumer Protection Act</u>

18.  In 1991, Congress enacted the TCPA to restrict the use of sophisticated

---

[1]     www.robocallindex.com

[2]     www.cndb.com/2021/06/29/americans-list-billions-of-dollars-to-phone-scams-over-the-past-year.html

telemarketing equipment that could target millions of consumers *en masse.* Congress found that these calls were not only a nuisance and invasion of privacy to consumers specifically, but were also a threat to interstate commence generally. *See* S. Rep. No. 102-178, at 2-3, 1991 U.S.C.C.A.N. 1968, 1969-71, 1991 WL 211220 (1991).

19.   The TCPA imposes restrictions on the use of automated telephone equipment.  47 U.S.C. § 227(b)(1).

20.   Pursuant to authority delegated by Congress to the FCC under the TCPA at 47 U.S.C. § 227(b)(2), the FCC has adopted regulations to implement the aforesaid restrictions on use of automated telephone equipment. The TCPA implementing regulations are promulgated at 47 C.F.R. 64.1200(a), *et seq.*

21.   As part of the restrictions on use of automated telephone equipment, Congress created a private right of action for aggrieved persons to received $500.00 in damages for *each* violation of the subsection of the statute or the regulations prescribed thereunder, which amount the court may treble if the court finds that the defendant willfully or knowingly violated the statute or the regulations. 47 U.S.C. § 227(b)(3).

22.   Additionally, the Congress also sought to protect subscriber privacy rights, and directed the FCC to initiate a rulemaking proceeding to compare and evaluate alternative methods and procedures, and to develop proposed regulations to implement the methods and procedures that the FCC determines are most efficient to accomplish the need to protect telephone subscribers' privacy rights to avoid receiving telephone

solicitations to which they object.  47 C.F.R. § 227(c)(1).  The FCC conducted such a rulemaking and implemented regulations to protect telephone subscribers' privacy rights. See *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 68 FR 44144, 2003 WL 21713245 (2003).

23.  As part of the protection of subscriber privacy rights, Congress created a private right of action for aggrieved persons to receive $500.00 in damages for *each* violation of the subsection of the statute or the regulations prescribed thereunder, which amount the court may treble if the court finds that the defendant willfully or knowingly violated the statute or the regulations. 47 U.S.C. § 227(c)(5).

## Michigan Home Solicitation Sales Act

24.  The Michigan Legislature has also enacted statutes governing and restricting telephone solicitors from making or causing to be made a telephone solicitation to a residential telephone subscriber.  The restrictions include a prohibition on telephone solicitations using in whole or in part a recorded message. M.C.L. § 445.111(a)(1).  A telephone solicitor shall not make a telephone solicitation to a residential telephone subscriber whose name and residential telephone number appears on the national do-not-call list.  M.C.L. § 445.111(a)(4).  Telephone solicitors must properly identify themselves and their organization.  M.C.L. § 445.111b(1) and (2).  Telephone solicitors may not block or otherwise interfere with the caller ID function of the telephone. M.C.L. § 445.111b(3).  Further, telephone solicitors may not engage in specified unfair or deceptive acts or practices as set forth in the act. M.C.L. § 445.111c.

6

25.  The MHSSA provides that a person who suffers a loss as a result of violation of the MHSSA may bring an action to recover actual damages or $250.00, together with reasonable attorney fees.  M.C.L. § 445.111c(3).

General Allegations

26.  Plaintiff's residential and cellular telephone lines have been besieged with telemarketing calls hawking such things as alarm systems, Google listings, automobile warranties, health insurance, life insurance, credit cards, and even financial miracles from God.  Some calls are blatant scams, including calls purportedly from the Social Security Administration, the U.S. Drug Enforcement Administration, and other government agencies, some claiming that arrest warrants have been issued against Plaintiff for alleged drug trafficking and money laundering activities.

27.  Plaintiff's cellular telephone number is 734-***-9671.

28.  Plaintiff's cellular telephone number 734-***-9671 is listed on the National Do Not Call Registry maintained by the United States Federal Trade Commission pursuant to 16 C.F.R. Part 310 and has been so listed continuously since at least December 9, 2004, and at all times subsequent thereto and relevant hereto.

29.  Plaintiff uses his cellular telephone primarily for personal, family, and household communications, and not for business purposes.

30.  By listing his cellular telephone number on the National Do Not Call Registry, Plaintiff has given constructive notice to the World, including the Defendant, that Plaintiff does not wish to receive telephone solicitations or robocalls at his

residential telephone number.

31. Courts are legally bound to give great deference to the FCC's interpretations of the TCPA and its own regulations. See *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981) ("the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong ...").

32. The FCC has issued a declaratory ruling defining "called party" as "the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02–278, WC Docket No. 07–135, FCC 15–72, 2015 WL 4387780, at *26 ¶ 73 (2015).

33. Plaintiff is the customary user of the called telephone line, is the one that was the actual recipient of the telephone calls at issue in this complaint, and suffered the nuisance and invasion of privacy of same. Thus, Plaintiff has standing to bring this action for alleged violations of TCPA's provisions. See *Leyse v. Bank of America Nat. Ass'n*, 804 F.3d 316, 324 (3rd Cir., 2015).

34. The FCC has ruled that wireless subscribers who ask to be put on the national do-not-call list are presumed to be "residential subscribers." *In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14039, 2003 WL 21517853, at *14, ¶ 36 (2003).

35.   A text message to a cellular telephone qualifies as a "call" within the compass of the TCPA. *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 667, 577 U.S. 153, 156 (2016).

36.   At no time relevant hereto has Plaintiff or any other authorized person requested, consented, permitted, or authorized the contact from the Defendant.

37.   At no time has Plaintiff provided permission to the Defendant to engage in telephone solicitation with the Plaintiff via telephone.

38.   At no time has Plaintiff provided "prior express consent" or "prior express written consent" (as those terms are defined under the TCPA and as interpreted by the FCC) for the Defendant or anyone acting on behalf of the Defendant to initiate any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to Plaintiff's cellular telephone number.

39.   At no time has Plaintiff had an "established business relationship" (as that term is defined under the TCPA and as interpreted by the FCC) with the Defendant.

40.   The FCC has declared that a necessary element for a person to provide "consent" is that the person must knowingly and voluntarily provide the telephone number at which they are authorizing telemarketing calls to be received at.   For example, capturing a caller's telephone number by a Caller ID or ANI device cannot be considered consent to receive telemarketing calls. *In the Matter of Rules and Regulations Implementing the TCPA*, 7 FCC Rcd. 8752, 8769, 1992 WL 690928, at

*11, ¶ 31 (1992).

41.  The FCC has further declared that persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, if the caller is making calls within the scope of the consent given, and absent instructions to the contrary. *In the Matter of Rules and Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 8028, 2015 WL 4387780, at *47, ¶ 141 (2015).

42.  Similarly, for purposes of an "established business relationship," the FCC has declared that a consumer inquiry cannot be considered to create a business relationship where the consumer's number has been captured absent that consumer's express invitation or permission to be contacted at the captured number. *In the Matter of Rules and Regulations Implementing the TCPA*, 7 FCC Rcd. 8752, 8771, 1992 WL 690928, at *13, n. 67 (1992).

43.  At no time has Plaintiff released his phone number to any of the Defendants in order to have given invitation or permission to be called at that number.

44.  Consent cannot be "presumed." The TCPA and the Commission's rules plainly require express consent, not implied or "presumed" consent. *In re Rules and Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 7991, 2015 WL 4387780, at *20, ¶ 52 (FCC, 2015).

45.  The FCC has declared that "[p]urporting to obtain consent during the call... does not constitute the *prior* consent necessary to deliver the message in the first place

as the request... is part of the telemarketing." *In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14019, 2003 WL 21517853, at \*49, ¶ 142 (2003) [Emphasis as in original].

46.  The TCPA places no affirmative obligation on a called party to opt out of calls to which he or she never consented.  *In re Rules and Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 8004, 2015 WL 4387780, at \*29, ¶ 81 (2015).

47.  The FCC has clarified that sellers may be held vicariously liable for violations of the TCPA by third-party telemarketers that initiate calls to market the seller's products or services, declaring as follows:

> "[A] company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our telemarketing rules and calls placed by a third party on behalf of that company are treated as if the company itself placed the call."

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 20 FCC Rcd. 13664, 13667, 2005 WL 1981564, at \*3, ¶ 7 (2005).

48. A seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification. *In re Dish Network,* 28 FCC Rcd. 6574, 6584, 2013 WL 1934349, at \*9, ¶ 28 (2013).

49. A seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's

behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct. *In re Dish Network,* 28 FCC Rcd. 6574, 6592, 2013 WL 1934349, at *15, ¶ 46 (2013).

50. Pursuant to 47 U.S.C. § 217, the act, omission, or failure of any officer, agent, or other person acting for or employed by an common carrier or user, acting within the scope of his employment, shall in every case also be deemed to be the act, omission, or failure of such carrier or user as well as that of the person.

51. When considering individual corporate officer liability, other Courts have agreed that a corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *See*, *e.g.*, *Jackson Five Star Catering, Inc. v. Beason,* No. 10-10010, 2013 WL 5966340, *4 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participating in or personally authorized the conduct found to have violated the statute.") (internal citation omitted); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D.MD. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

52. It is well settled under Michigan law that corporate employees and officials are personally liable for all tortious and criminal acts in which they participate, regardless of whether they are acting on their own behalf or on behalf of a corporation. A corporate officer or director is, in general, personally liable for all torts which he

authorizes or directs or in which he participates, notwithstanding that he acted as an agent for the corporation and not on his own behalf.

53. For each and every call alleged herein initiated to Plaintiff's telephone line, Plaintiff suffered the injury of invasion of privacy and intrusion on Plaintiff's right of seclusion.

54. For each and every call alleged herein initiated to Plaintiff's telephone line, Plaintiff suffered the injury of the occupation of the telephone line by unwelcome calls, making the phone unavailable for legitimate callers or outgoing calls, including emergency calls, when the telephone line was seized by Defendants' calls.

55. For each and every call alleged herein initiated to Plaintiff's telephone line, Defendants caused an injury in the form of a nuisance and annoyance to the Plaintiff. For calls that were answered, Plaintiff had to go to the unnecessary trouble of answering them. Even for unanswered calls, Plaintiff had to deal with missed call notifications and call logs that reflected the unwanted calls. This also impaired the usefulness of these features on Plaintiff's telephone, which features are designed to inform the user of important missed communications.

56. Each and every call placed without consent by Defendants alleged herein to Plaintiff's telephone lines resulted in the injury of a trespass to Plaintiff's chattel, namely Plaintiff's telephone line and its telephone services.

57. For purposes of the TCPA, the FCC has defined "willfully or knowingly" to mean that the violator knew that he was doing the act in question, in this case,

initiating a telephone solicitation, irrespective of any intent to violate the law. A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance.

<u>The Scheme</u>

58. Defendant Brookestone is a small business funding lender that solicits funding solutions to consumers throughout the United States.

59. Defendant Qubrusi holds himself out as the "owner" of Defendant Brookestone.

60. Defendant Qubrusi personally authorized, directed, and particiaptes in Brookestone's telemarketing activity,

61. Defendant Katz holds himself out as the "founder" of Defendant Brooketsone.

62. Defendant Katz personally participates in Brookestone's telemarketing activity.

63. Defendant Brookestone seeks out consumers and/or businesses in need of a loan and will then either enter into a direct lending relationship or facilitate a lending relationship between the consumer/business and a third-party lender.

64. As part of its marketing scheme, Defendant Brookestone relies upon telemarketing as a cost effective method of soliciting consumers across the United States.

65. Defendant Brookestone initiates telephone calls *en masse* using automated

telephone dialing systems which have the capacity to store or produce telephone numbers to be called using a random or sequential number generator to dial such numbers, to solicit consumers.

66.  Defendants obtain lists of names and telephone numbers of small business owners, input the lists into the automated telephone dialing system, and the automated system will then, using the random or sequential number generator, select numbers from the lists and dial them and transmit SMS text messages to the consumers.

67.  Subsequently, where Defendant Brookestone, through its SMS text messaging, has identified a potential small business owner, a live representative from Defendant Brookestone will then telephone the consumer.

68.  Defendant Brookestone does not scrub their outbound telephone lists against the National Do Not Call Registry.

69.  Defendant Brookestone does not have a written do not call policy, as is evidenced by the fact that, when Plaintiff requested a Brookestone representative to provide the policy, the representative was uncertain as to what that was and could not provide it.

<u>Call 1</u>

70.  On December 27, 2024 at 1:22 P.M., Defendant Brookestone initiated or caused the initiation and sending of an SMS text message to Plaintiff's cellular telephone number 734-***-9671.

71.  The caller identification number displayed was 541-394-5298.

15

72. The SMS text message read:

> Hey,
> Hope all is well.
>
> Reaching out regarding your inquiry - 2 days
> left for our No Fee special !!
>
> Around 2.3M left - Let me know what amount
> and term you're looking for, and we'll make it
> happen.
> _
> Reply STOP to opt-out

73. Being that the sender did not identify himself/herself, Plaintiff responded:

> Sorry, but who are you?

## Call 2

74. On December 27, 2024 at 1:26 P.M., Defendant Brookestone initiated or caused the initiation and sending of an SMS text message to Plaintiff's cellular telephone number 734-***-9671.

75. The caller identification number displayed was 541-394-5298.

76. The SMS text message read:

> Brookestone funding, we're direct lenders that
> provide Term loans up to 36 months, and line
> of credits up to 500K starting at 5%.  What's
> your target amount?

77. Inasmuch as Plaintiff is retired and did not make any inquiry about a loan, Plaintiff responded:

Did I send you a loan application?

<u>Call 3</u>

78.  On December 27, 2024 at 1:29 P.M., Defendant Brookestone initiated or caused the initiation and sending of an SMS text message to Plaintiff's cellular telephone number 734-***-9671.

79.  The caller identification number displayed was 541-394-5298.

80.  The SMS text message read:

Not yet, what's your best email ?

81.  Solely for purposes of better identifying the caller, and to better ascertain whether Plaintiff was being victimized in some sort of fraudulent scheme, Plaintiff responded with:

DavidHarlaw@memopad.us

which is a controlled email address.

<u>Calls 4 and 5</u>

82.  On December 27, 2024 at 1:32 P.M., Defendant Brookestone initiated or caused the initiation and sending of an SMS text message to Plaintiff's cellular telephone number 734-***-9671.

83.  The caller identification number displayed was 541-394-5298.

84.  The SMS text message read:

Sent over your application link coming from John@brookestonefunding.com

17

85. Which SMS text message was immediately followed by another SMS text message which read:

> Received it?

86. Plaintiff responded:

> I am confused. How did you get my number
> and know that I was looking for a loan?

87. Plaintiff received no message in reply to the foregoing response.

<u>Call 6</u>

88. On December 30, 2024 at 9:27 A.M., Defendant Brookestone initiated or caused the initiation and sending of an SMS text message to Plaintiff's cellular telephone number 734-***-9671.

89. The caller identification number displayed was 541-394-5298.

90. The SMS text message read:

> Any updates on your application?

91. Plaintiff did not respond to the message.

<u>Call 6</u>

92. On January 2, 2025 at 10:35 A.M., Defendant Brookestone initiated or caused the initiation and sending of an SMS text message to Plaintiff's cellular telephone number 734-***-9671.

93. The caller identification number displayed was 541-394-5298.

94. The SMS text message read:

Good morning, any updates?

95.  Plaintiff did not respond to the message.

<u>Call 7</u>

96.  On January 14, 2025 at 5:54 P.M., Defendant Brookestone initiated or caused the initiation of a telemarketing call to Plaintiff's cellular telephone number 734-***-9671.

97.  The caller identification number displayed was 718-300-2661, with no caller identification name information.

98.  Upon answering the telephone call by saying "hello", Plaintiff heard a click, followed by a brief period of silence, and then a live male voice could be heard saying: "Hey, how is everything going?  Every day above ground is a blessing.  This is Al Katz, we spoke a couple weeks ago on December 27 about a loan for the business."

99.  Plaintiff had not previously spoken with Al Katz.

100.  Katz represented that he had, on December 27, 2024, sent a loan application form to Plaintiff's controlled email address: DavidHarlow@memopad.us.

101.  Plaintiff did not receive any email on December 27, 2024 addressed to the controlled email address.

102.  Katz represented that he had received information "from a few other brokers" that Plaintiff was seeking a loan.

103.  Katz represented that he had analyzed Plaintiff's business and the loan application and had determined that Plaintiff was eligible for a loan of approximately

19

$350,000.00.

104.  Given that Plaintiff had retired approximately 3 years earlier, Plaintiff had not recently submitted any loan applications to any loan brokers or financial institutions.

105.  On January 14, 2025 at 6:02 P.M., Katz sent an email and a loan application form to Plaintiff's controlled email address with the subject line "The Dove Has Landed".

106.  The subject email identified Katz as "Senior Funder" for Brookestone Funding.

107.  At no time during the conversation did Plaintiff disclose his telephone number to Katz.

<u>Call 8</u>

108.  On January 14, 2025 at 6:32 P.M., Defendant Brookestone initiated or caused the initiation of a telemarketing call to Plaintiff's cellular telephone number 734-***-9671.

109.  The caller identification number displayed was 718-300-2661, with no caller identification name information.

110.  Upon answering the telephone call by saying "hello", Plaintiff heard a click, followed by a brief period of silence, and then a live male voice could be heard saying: "Hey, Mark?  How you doing Mark?"  Although the caller did not identify himself, Plaintiff recognized the voice as being Katz.

111.   Katz indicating that he was preparing to leave work for the day and he wanted to receive and review a loan application from Plaintiff before leaving.   Plaintiff explained that he was busy doing other things and would look the application over later.

112.   At no time during the conversation did Plaintiff disclose his telephone number to Katz.

<u>Call 9</u>

113.   On January 15, 2025 at 10:09 A.M., Defendant Brookestone initiated or caused the initiation of a telemarketing call to Plaintiff's cellular telephone number 734-***-9671.

114.   The caller identification number displayed was 718-300-2661, with no caller identification name information.

115.   Upon answering the telephone call by saying "hello", Plaintiff heard a click, followed by a brief period of silence, and then a live male voice could be heard saying: "Mark?   How you doing" and identified himself as "Al Katz with Brookestone."

116.   Katz was pushing Plaintiff to submit a loan application.

117.   Plaintiff inquired of Katz as to how he had obtained Plaintiff's name and telephone number, to which Katz responded that he had received a lead from Lending Tree or Lendio within the last month.

118.   Katz represented that Brookestone was a "private community bank."

21

119.  The State of New York, Department of Financial Services, does not list Brookestone as being registered as a banking institution.

120.  Katz represented to Plaintiff that Brookestone uses an automated telephone dialing system that takes a list of leads and all Katz has to do is press a single button and the computer system dials the telephone numbers for him and connects him when the called party answers.

121.  Plaintiff asked Katz to send to Plaintiff's email address, a copy of Brookestone's written do not call policy, and a copy of the written consent that Lending Tree or Lendio had provided indicating invitation or permission to call Plaintiff's cellular telephone number 734-***-9671.

122.  Katz did not send a written do not call policy, nor the purported consent.

123.  At no time during the conversation did Plaintiff disclose his telephone number to Katz.

Call 10

124.  On January 16, 2025 at 10:27 A.M., Defendant Brookestone initiated or caused the initiation of a telemarketing call to Plaintiff's cellular telephone number 734-***-9671.

125.  The caller identification number displayed was 718-300-2661, with no caller identification name information.

126.  Upon answering the telephone call by saying "hello", Plaintiff heard a click, followed by a brief period of silence, and then a live male voice could be heard

saying: "Hey, Mark, how's everything going?... This is Al Katz."

127.  Katz was, again, pushing Plaintiff to submit a loan application.

128.  Plaintiff told Katz that Plaintiff was busy and could not deal with this matter at this time.

129.  At no time during the conversation did Plaintiff disclose his telephone number to Katz.

<u>Call 11</u>

130.  On January 17, 2025 at 2:03 P.M., Defendant Brookestone initiated or caused the initiation of a telemarketing call to Plaintiff's cellular telephone number 734-***-9671.

131.  The caller identification number displayed was 718-300-2661, with no caller identification name information.

132.  Upon answering the telephone call by saying "hello", Plaintiff heard a click, followed by a brief period of silence, and then a live male voice could be heard saying: "Yeah, brother, you don't have my number saved by now?... This is Albert Katz from Brookestone."

133.  Katz was pushing Plaintiff to submit a loan application, indicating that he was trying to get Plaintiff approved for a loan of $400,000 to $500,000.

134.  Plaintiff told Katz that Plaintiff was busy and could not deal with this matter at this time.

135.  At no time during the conversation did Plaintiff disclose his telephone

number to Katz.

Call 12

136.   On January 21, 2025 at 9:38 A.M., Defendant Brookestone initiated or caused the initiation of a telemarketing call to Plaintiff's cellular telephone number 734-***-9671.

137.   The caller identification number displayed was 718-300-2661, with no caller identification name information.

138.   Upon answering the telephone call by saying "hello", Plaintiff heard a click, followed by a brief period of silence, and then a live male voice could be heard saying: "Good morning Mark, how you doing?  How was you week?"  The caller did not identify by name or provide a company name, but Plaintiff recognized the voice as being Katz.

139.   Katz asked if Plaintiff had received the gift package that he had allegedly sent saying "free loan."  Katz then stated that he was kidding and again was pressing Plaintiff to submit a loan application.

140.   At no time during the conversation did Plaintiff disclose his telephone number to Katz.

Call 13

141.   On January 27, 2025 at 11:14 A.M., Defendant Brookestone initiated or caused the initiation of a telemarketing call to Plaintiff's cellular telephone number 734-***-9671.

24

142.   The caller identification number displayed was 718-300-2661, with no caller identification name information.

143.   Upon answering the telephone call by saying "hello", Plaintiff heard a click, followed by a brief period of silence, and then a live male voice could be heard saying: "Mark?  How you doing, brother?  You still don't have my number saved?  This is Al Katz, here.  You were looking for about 500 thousand."

144  Katz was pushing Plaintiff to submit a loan application.

145.   Plaintiff told Katz that Plaintiff was busy and that he would call Katz back when he was not occupied, which would be about two weeks.

146.   At no time during the conversation did Plaintiff disclose his telephone number to Katz.

<u>Subsequent Investigation</u>

147.   Plaintiff communicated with Defendant Qubrusi to complain about receiving the unwanted telemarketing calls.

148.   Qubrusi disclosed that he is the "owner" of Brookestone.

149.   Qubrusi disclosed that he has a team of 3 employees that initiate hundreds of telemarketing calls "every day, all day long" using an automatic telephone dialing system.

150.   Plaintiff made demand to Qubrusi for a copy of Brookestone's written Do Not Call policy.  Qubrusi responded "What's that?".

151.   Plaintiff made demand to Qubrusi to place Plaintiff's telephone number

on Brookestone's Do Not Call list.  Qubrusi responded "Why would I want to do that?".

152.  Subsequent investigation has disclosed that Brookestone has, as recently as September 23, 2024, been named as a defendant in a class action alleging similar violations of the TCPA as in this case. *See Ehde v. Brookstone Funding Inc.*, Case No. 24-cv-06676 (E.D. N.Y.) Thus, at the time of the calls alleged herein, the violations by Brookestone were willful and/or knowing as  Brookestone clearly had notice of its illegal conduct, but had taken no action to curtail its illegal telemarketing activities.

## COUNT I
## TCPA VIOLATION - AUTOMATED CALL

153.  Plaintiff incorporates the allegations of paragraphs 1 through 152, *supra.*

154.  The use of an automatic telephone dialing system is evident in the SMS text messages received in Calls 1 and 2, *supra*, as the messages were generic and impersonal.

155.  The fact that Plaintiff's inquiry message sent during Call 5, *supra*, was not responded to also infers the use of automated intelligence (AI); the AI system did not have a pre-programmed response for the inquiry..

156. Each of Calls 1 through 13, *supra*, were in violation of 47 C.F.R. § 64.1200(a)(1)(iii), as Defendant or Defendant's agent initiated a telemarketing call to a cellular telephone line using an automatic dialing system without the prior express consent of the called party and there being no emergency.

157. The aforesaid violations of the TCPA were willful and/or knowing as is evidenced by the repetitive number of calls, and the fact that Plaintiff had made a STOP demand during Call 1.

## COUNT II
## TCPA VIOLATION - AUTOMATED CALL

158. Plaintiff incorporates the allegations of paragraphs 1 through 152, *supra.*

159. Additionally, or in the alternative, each of Calls 1 through 13, *supra*, were in violation of 47 C.F.R. § 64.1200(a)(2), as Defendant or Defendant's agent initiated a telemarketing call to a residential telephone line using an automatic dialing system without the prior express written consent of the called party and there being no emergency.

160. The aforesaid violations of the TCPA were willful and/or knowing as is evidenced by the repetitive number of calls.

## COUNT III
## TCPA VIOLATION - DO NOT CALL REGISTRY

161. Plaintiff incorporates the allegations of paragraphs 1 through 152, *supra*.

162. At no time did Plaintiff consent to an "established business relationship" with any of the Defendants as Plaintiff never provided his telephone number to the Defendant or Defendant's agent to call.

163. Each of Calls 1 through 13, *supra*, were in violation of 47 C.F.R. § 64.1200(c)(2), as Defendants or Defendants' agent initiated a telephone solicitation to

a residential telephone number listed on the National Do Not Call Registry of persons who do not wish to receive telephone solicitations.

164.  The aforesaid violations of the TCPA were willful and/or knowing as is evidenced by the repeated number of calls.

## COUNT IV
## TCPA VIOLATION - NO DNC PROCEDURES

165.  Plaintiff incorporates the allegations of paragraphs 1 through 152, *supra*.

166.  No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by on behalf of that person or entity.  47 C.F.R. § 64.1200(d).

167.  The fact that Brookestone has not instituted such procedures is evident from the number of violations disclosed in this Complaint, and the fact that Katz and Qubrusi were unable to provide a written do-not-call policy.

168.  Each of Calls 1 through 13, *supra*, were in violation of 47 C.F.R. § 64.1200(d)(4), as Defendant or Defendant's agent initiated the calls for telemarketing purposes without there having been instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made on behalf of that person or entity.

169.  The aforesaid violations of the TCPA were willful and/or knowing as is evidenced by the repeated number of calls.

28

## COUNT V
## TCPA VIOLATION - NO WRITTEN DNC POLICY

170.  Plaintiff incorporates the allegations of paragraphs 1 through 152, *supra*.

171.  Call 9, *supra*, was in violation of 47 C.F.R. § 64.1200(d)(1), as Defendant did not provide a copy of Defendant's written do not call policy in response to Plaintiff's demand for a copy of same.

172.  The aforesaid violation of the TCPA were willful and/or knowing as is evidenced by the repeated number of calls with violations.

## COUNT VI
## TCPA VIOLATION - FAILURE TO IDENTIFY

173.  Plaintiff incorporates the allegations of paragraphs 1 through 152, *supra*.

174.  Each of Calls 1, 3, 5, 6, 8, 10, 12 and 13, *supra*, were in violation of 47 C.F.R. § 64.1200(d)(4), as Defendants or Defendants' agent did not provide Plaintiff with the name of the individual caller and/or the name of the person or entity on whose behalf the call was being made, and a telephone number or address at which the persona or entity may be contacted.

175.  The aforesaid violations of the TCPA were willful and/or knowing as is evidenced by the repeated number of calls.

## COUNT VII
## MHSSA VIOLATION

176.  Plaintiff incorporates the allegations of paragraphs 1 through 152, *supra.*

177.  Each of Calls 1 though 13, *supra*, were in violation of M.C.L. §

445.111a(5), as Defendant and/or Defendant's agent made a solicitation to a residential telephone subscriber whose name and residential telephone number is on the federal do-not-call list; and each of Calls 1, 3, 5 through 8, 10, 12 and 13, *supra*, were in violation of M.C.L. § 445.111b(1), as Defendant and/or Defendant's agent did not, at the beginning of the telephone solicitation, state his or her name and the full name of the organization on whose behalf the call was initiated.

## PRAYER FOR RELIEF

WHEREFORE, the aforesaid premises considered, Plaintiff prays that this Court enter a judgment for Plaintiff and against the Defendants, and each of them jointly and severally, as follows:

A.    Damages:

I.    Damages for violations of the TCPA alleged:

| Count | Violations |
|-------|------------|
| I | 13 |
| II | 13 |
| III | 13 |
| IV | 13 |
| V | 1 |
| VI | 8 |

A total of 61 violations at $500.00 per violation for damages of $30,500.00, which amount shall be trebled because the violations were willful and/or knowing, for total damages of $91,500.00.

ii.    Damages for violations of the MHSSA alleged at Count VII: 13

violations at $250.00 per violation, for damages of $3,250.00;

The cumulative total amount of damages claimed in this action (exclusive of additional calls and violations to be ascertained during discovery) is $94,750.00, and in the event of default judgment is the sum certain damages amount that will be sought.

B.  An award of Plaintiff's taxable costs and disbursements incurred in the filing and prosecution of this action;

C.   An injunction enjoining Defendants and/or Defendants' agents from initiating any telephone calls to Plaintiff's telephone numbers.

D.  Interest accruing from the date of filing until paid at the statutory rate; and,

E.   Such other and further relief as this Court deems necessary, reasonable, prudent and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff makes demand for a jury trial as to all the issues so triable.

Respectfully submitted,

Dated: March 26, 2025

_____
Mark W. Dobronski
Post Office Box 99
Dexter, Michigan 48130-0099
Telephone: (734) 641-2300
Email: markdobronski@yahoo.com
Plaintiff *In Propria Persona*

## <u>VERIFICATION</u>

I, the undersigned, the Plaintiff in the above-captioned matter, declare that I have read the foregoing Complaint and know its contents.  Further, I declare that the Complaint is true to my own knowledge, except as to matters therein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing verification is true and correct.

Dated: March 26, 2025

_____

Mark W. Dobronski